**Susan F. Wilk**
**Assistant Federal Public Defender**
**101 S.W. Main Street, Suite 1700**
**Portland, Oregon 97204**
**(503) 326-2123 Telephone**
**(503) 326-5524 Facsimile**
**susan_wilk@fd.org**

**Attorney for Petitioner**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

|  |  |
|---|---|
| **JEFFREY BRIAN JOHNSON,** | Case No. 2:22-cv-01726-JR |
| Petitioner, | |
| v. | **BRIEF IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS** |
| **JAMIE MILLER, Superintendent, Snake River Correctional Institution,** | |
| Respondent. | |

# Table of Contents

                                                                                    **Page**

Table of Contents .................................................................................................... i

Table of Authorities ............................................................................................... iii

I.    Introduction And Summary Of Argument ...................................................... 1

II.   Statement of Facts ........................................................................................ 2

III.  Direct Appeal And Post-Conviction Proceedings. .......................................... 14

IV.   Habeas Corpus Proceedings ......................................................................... 15

V.    Argument in Support of Petition for Writ of Habeas Corpus ........................... 16

      A.    Mr. Johnson Was Denied His Sixth Amendment Right To Effective
            Assistance Of Counsel By His Lawyer's Failure To Object To Or Move
            To Strike Rebuttal Evidence That Lacked A Proper Foundation. ................... 16

            1.    An Accused Person Is Guaranteed The Right To Effective
                  Assistance Of Counsel. ........................................................... 16

            2.    The Post-Conviction Court's Finding That Mr. Johnson's Lawyer
                  Reasonably Believed The Evidence Was Relevant And
                  Admissible Unreasonably Applied *Strickland* And Unreasonably
                  Determined The Facts. ............................................................ 17

            3.    Reasonably Competent Defense Counsel Would Have Objected
                  To Inadmissible Evidence That Undermined The Defense Theory.
                  .......................................................................................... 21

            4.    Mr. Johnson Was Prejudiced By His Lawyer's Omission. ............. 22

      B.    Mr. Johnson Was Denied His Sixth Amendment Right To Effective
            Assistance Of Counsel By His Lawyer's Failure To Preserve Or Make
            Proper Arguments For The Admissibility Of Evidence Essential To His
            Extreme Emotional Disturbance Defense. ................................................ 23

            1.    The Post-Conviction Court Unreasonably Applied Federal Law
                  And Unreasonably Determined The Facts In Ruling That Counsel
                  Performed Competently Despite His Failure To Advance And
                  Preserve Arguments For The Admissibility Of Evidence Of
                  Mr. Johnson's Pacifism, Inclination Towards Compromise, And
                  Protectiveness Of Family. ....................................................... 23

2.    Counsel Deficiently Failed To Argue For Admission Of The Evidence Under The First, Subjective Prong Of The Extreme Emotional Disturbance Defense. ............................................. 27

3.    Mr. Johnson Was Prejudiced By His Lawyer's Deficient Performance.............................................................................. 29

C.    Mr. Johnson's Lawyer Was Ineffective For Failing To Object To Jury Instructions That Increased The Defense Burden Of Proving An Extreme Emotional Disturbance And Failing To Request Instructions Necessary For A Proper Determination Of The Legal Defense. ............................................. 30

1.    Under Oregon Law, Mr. Johnson's Appellate Counsel Exhausted Mr. Johnson's Ground III(E) And (F) Claims By Advocating For Review, Citing *Farmer v. Baldwin*, And Incorporating By Reference His Arguments On Appeal. .................................................. 30

2.    Trial Counsel's Failure To Object To The Court's Instruction That Erroneously Increased Mr. Johnson's Burden Of Proof Regarding The Extreme Emotional Disturbance Defense And To Propose Accurate Instructions Was Deficient Performance That Prejudiced Mr. Johnson. ............................................................................... 33

D.    Cumulative Error Denied Mr. Johnson A Fair Trial. ......................................... 36

VI.    Conclusion ................................................................................................. 37

## Table of Authorities

**Federal Cases**              **Page(s)**

*Baer v. Neal*,
   879 F.3d 769 (7th Cir. 2018) ............................................................. 33

*Bardales v. Howton*,
   No. 6:07-cv-06358-AA, 2010 WL 3866716 (D. Or. Sept. 26, 2010) ............. 33

*Carrillo-Carrillo v. Coursey*,
   823 F.3d 1217 (9th Cir. 2016) ........................................................... 32

*Casey v. Moore*,
   386 F.3d 896–16 (9th Cir. 2004) ...................................................... 31

*Chambers v. Mississippi*,
   410 U.S. 284 (1973) ....................................................................... 36

*Clegg v. Premo*,
   No. 6:15-CV-01661-MK, 2021 WL 11141284 (D. Or. Apr. 21, 2021) ......... 32

*Dixon v. Baker*,
   847 F.3d 714–23 (9th Cir. 2017) ...................................................... 21

*Duncan v. Henry*,
   513 U.S. 364 (1995) ....................................................................... 30

*Gray v. Lynn*,
   6 F.3d 265 (5th Cir. 1993) ............................................................... 35

*Hennessy v. Goldsmith*,
   929 F.2d 511 (1991) ....................................................................... 34

*Hernandez v. Chappell*,
   923 F.3d 544 (9th Cir. 2019) ........................................................... 23

*Hinton v. Alabama*,
   571 U.S. 263 (2014) ................................................................... 23, 29

*In re Winship*,
   397 U.S. 358 (1970) ....................................................................... 34

*Kipp v. Davis*,
    971 F.3d 939 (9th Cir. 2020) .................................................................. 18, 21

*Martin v. Grosshans*,
    424 F.3d 588 (7th Cir. 2005) ......................................................................... 18

*Mathews v. United States*,
    485 U.S. 58 (1988) ......................................................................................... 34

*Means v. Horel*,
    805 F. Supp. 2d 1013 (E.D. Cal. 2011) ......................................................... 20

*Morris v. California*,
    966 F.2d 448–55 (9th Cir. 1991) ................................................................... 23

*Panetti v. Quarterman*,
    551 U.S. 930 (2007) ........................................................................... 21, 27, 28

*Parle v. Runnels*,
    505 F.3d 922 (9th Cir. 2007) ......................................................................... 36

*Picard v. Connor*,
    404 U.S. 270 (1971) ....................................................................................... 30

*Premo v. Moore*,
    562 U.S. 115 (2011) ....................................................................................... 17

*Roe v. Flores–Ortega*,
    528 U.S. 470 (2000) ....................................................................................... 21

*Strickland v. Washington*,
    466 U.S. 668 (1984) ........................................................................... 17, 22, 30

*Taylor v. Maddox*,
    366 F.3d 992 (9th Cir. 2004) ......................................................................... 18

*United States v. Span*,
    75 F.3d 1383 (9th Cir. 1996) ......................................................................... 35

*Vasquez v. Hillery*,
    474 U.S. 254 (1986) ....................................................................................... 31

*Wiggins v. Smith*,
    539 U.S. 510 (2003) ....................................................................................... 17

*Williams v. Taylor*,
    529 U.S. 362 (2000) ........................................................................ 20

**Federal Statutes**

28 U.S.C. § 2254(b)(1)(A) ................................................................. 31
28 U.S.C. § 2254(d) .......................................................................... 18
28 U.S.C. § 2254(d)(1) ...................................................................... 25
28 U.S.C. § 2254(d)(2) ...................................................................... 19

**State Cases**

*Farmer v. Baldwin*,
    346 Or. 67, 205 P.3d 871 (2009) ........................................ 16, 32, 33

*State v. Counts*,
    311 Or. 616, 622-23 (1991) ...................................................... 25, 26

*State v. Johnson*,
    288 Or. App. 528 (2017) ........................................................... 14, 15

*State v. Ott*,
    297 Or. 375 (1984) ........................................................................ 24

*Wilson v. Laney*,
    317 Or. App. 324 (2022) ................................................................ 20

**State Statutes**

Or. Rev. Stat. § 163.115(1)(a) ..................................................... 25, 26
Or. Rev. Stat. § 163.135 .................................................................... 14
Or. Rev. Stat. § 163.135(1) ...................................................... 25, 26, 34

**Rules**

Oregon Evidence Rule 801 ....................................................... 18, 19, 21

## I.    Introduction And Summary Of Argument

Jeffrey Johnson's young daughter was involved in a bitter custody dispute with the father of her son, a medically vulnerable child. Over the course of many months, the situation deteriorated to the point where the child's father was convicted of harassment based on threats against Mr. Johnson's daughter and grandson and demonstrated a disturbing willingness to push and shove Mr. Johnson's daughter even in Mr. Johnson's presence. After a family judge refused to intervene or take Mr. Johnson's concerns for his daughter and grandson's safety seriously, Mr. Johnson became overwhelmed by anxiety and fear. Ultimately, he shot and killed his grandson's father.

At trial, Mr. Johnson argued that he acted under an extreme emotional disturbance, a defense under Oregon law that reduces a charge of murder to manslaughter. He was denied the effective assistance of counsel guaranteed by the Sixth Amendment when his lawyer failed to research and argue basic points of law necessary to Mr. Johnson's extreme emotional disturbance defense. He did not object to inadmissible testimony that the State introduced and argued to support an inference of planning and premeditation. He did not properly research the defense he had presented, leading him to fail to advance arguments that would have supported admission of evidence of Mr. Johnson's pacifism, nonviolence, inclination towards compromise, and protectiveness of his family as relevant to his subjective circumstances. He also failed to except to jury instructions that increased the defense burden to prove that Mr. Johnson acted under an extreme emotional disturbance and failed to propose jury instructions that accurately stated the law.

The post-conviction court unreasonably applied federal law and unreasonably determined the facts in excusing counsel's unprofessional decisions. On *de novo* review, this Court should

conclude that Mr. Johnson's lawyer performed deficiently, resulting in prejudice, and grant the writ.

## II.    Statement of Facts

Mr. Johnson is serving a life sentence following his Washington County conviction for the murder of Ryan Johnson with a firearm. Resp. Ex. 101. The shooting took place on January 26, 2012, at the Bales Marketplace on Farmington Road in Aloha. Tr. 522.

The trial evidence established that Michael Huppi was shopping at Thriftway when he saw Mr. Johnson's cream-colored Audi drive past him and park in an end stall in front of the Thriftway. Tr. 581-82. Because Mr. Johnson was driving strangely, Huppi decided to pull near him. Tr. 582. He saw Mr. Johnson look through the window on the driver's side of the Audi, then exit and walk a few stalls away. Tr. 583. Huppi heard four gunshots, then he saw Mr. Johnson run fast across the front of the car and get in. Tr. 584. Huppi decided to pull behind him and get Mr. Johnson's license plate number. He ended up following him out of the parking lot westbound onto Farmington Road. Tr. 584-88. Huppi called 911 and reported the incident and that he was following him, but lost Mr. Johnson's car in other traffic. Tr. 595.

Sherwood Police Officer Corey Jentsch responded to the police dispatch regarding the shooting and pulled Mr. Johnson over. Tr. 627-28. Mr. Johnson cooperated with officers' directives and was taken into custody. Tr. 629-31, 636, 657, 660, 668. He was visibly nervous, shaking, and sweaty. Tr. 667. Detective Kevin Dresser obtained Mr. Johnson's consent to search his car. Tr. 637, 674. 721.

Within the car, on the passenger-side floorboard, was a black stocking cap. Tr. 675, 723. An unzipped black backpack containing black latex gloves and a small can of Remington gun oil was on the passenger seat. Tr. 675, 723, 742. There also was a small semi-automatic Bersa

Firestorm .380 handgun in a clear zip-lock baggie, with the magazine removed. Tr. 675. In the bag were three magazines. One was empty, and the other two were fully loaded with seven rounds each. Tr. 676. Six .380 Hornady brand shell casings were found at the scene of the shooting. Tr. 613.

In Mr. Johnson's wallet was a Bi-Mart receipt for the gun oil from 1:49 p.m. that day. Tr. 687-88, 701. In the glove box of the Audi, officers located a bill of sale indicating that Mr. Johnson bought the vehicle on January 23, 2012. Tr. 751.

Law enforcement ran a trace on the Bersa Firestorm .380 caliber handgun, identifying the last known purchaser as Jeremy Russell Kent. Tr. 763. Police interviewed Kent, who indicated that he sold the gun to Mr. Johnson at a gun show in St. Helens, Oregon, on November 12, 2011. Tr. 772, 799-801. Kent brought this and two other guns to sell at the gun show. Tr. 785. Mr. Johnson approached him in the parking lot and purchased the gun, two holsters, ammunition, a soft zipper case, and the manufacturer's box for $250, paying in cash. Tr. 791-96.

Detective Michael Hanada analyzed cell phone data from Ryan and Mr. Johnson's phones and extracted text messages between them which the State presented at trial. On October 14, 2011, Ryan texted Mr. Johnson, "Jeff, this is Ryan I would like to know where I am to meet you to pick up [R], or you can drop him off, your choice." Tr. 834.[1] Mr. Johnson responded, "Considering how things went Saturday, Megan would feel more comfortable if I were to accompany you during your visitation time with [R] and if we were to remain at a public location. How would you feel about that?" *Id*. Ryan replied, "Sorry. Not happening. Sorry." Tr. 835. He

---

[1] Because Ryan and Mr. Johnson's daughter Megan's last names also are Johnson, they are referred to herein by their first names. Ryan and Megan's minor child is referred to in this brief by his first initial, R.

also texted, "I appreciate the thought and concern, but I am not having third party contact and am filing a restraining order against her." *Id*. He then asked Mr. Johnson to "name a place to meet" and to drop off R. *Id*. He warned Mr. Johnson that if he "fail[ed] to comply," he had "enforcement paper to process" and that "it's hurting [R]." *Id*.

On October 16, 2011, Mr. Johnson told Ryan that Megan would be "appearing before the judge tomorrow at 8:30 a.m. for an *ex parte* motion for post judgment." *Id*. Ryan responded, "Good luck. I will be right there along with you guys to motion for enforcement and this restraining order will be dropped. And Jeff, I would like if you act as a witness to tell nothing but the truth." *Id*. He said he was "not giving up," that he was "saddened [Mr. Johnson] didn't text [him] and allow [him] to see [his son]," ending sarcastically, "Good job being a grandparent." *Id*.

Subsequently, on October 19, 2011, Mr. Johnson called Ryan to try to talk things through. Tr. 838. Ryan declined, stating that he did not think there would be any reason to meet because "we've already dealt all the bad blood out and … everything's been said that needs to be said." Tr. 839. He acknowledged that he "wasn't there enough for [R]," but said he did not believe "that other stuff that's been made to make me seem like a horrible father." Tr. 841. He denied that he had ever pushed Megan or "shoved Megan into a door frame like she suggested that I did." Tr. 842. He agreed that he was not a good father at the beginning, explaining that he was a teenager and "a typical teen father." Tr. 845. He then stated, "I don't want anything to do with you guys after I get my son on my own." Tr. 846.

On October 20, 2011, Mr. Johnson texted Ryan, "I would still like to get together and talk about supervised visitation Saturday. I want to make sure things go well. I think it would in [R]'s best interest if we have some things worked out ahead of time. Let me know." Tr. 847. Ryan

responded telling Mr. Johnson to "name a place to meet" for his supervised visit with R and stating, "My parents will be with me and we'll go from there." *Id*. On October 21, 2011, Ryan sent a further text message to Mr. Johnson, who proposed they meet at the Beaverton City Library, "and since you didn't agree to meet with me before tomorrow to talk about how things should go, I'm going to ask that your parents not be present because that would make me uncomfortable." Tr. 848. Ryan responded, "My parents are allowed to come. Sorry. Court agreement." *Id*.

From there, communications became increasingly acrimonious, with Ryan texting Mr. Johnson, "I feel it's my not responsibility to provide [R] with lunch. I also ask you pack him lunch, and he eat while with me. Now, the parenting time doesn't say you can make personal rules that say I must make lunch, when I am not the primary caregiver." *Id.* Ryan also texted Mr. Johnson asking that he not "stand directly over me … and like Judge Erwin told your wife, Mary Johnson, to not be directly behind me when with [R] because that would make the parenting time pointless[.]" Tr. 848-49. To this, Mr. Johnson responded, "Because we didn't have an opportunity to meet and discuss visitation beforehand, I would not be comfortable exposing [R] to a volatile and potentially hostile situation. If you cannot agree to do what's necessary for me to feel comfortable as your supervisor, and insist on bringing your parents, visitation will not be possible at this time. Please refer to the email I sent you detailing supervised parenting time." Tr. 849.

Ryan responded that if Mr. Johnson tried to "hinder" his visitation, he would take him back to court. Tr. 849-50. As Ryan continued to send text messages in this vein, Mr. Johnson asked him to limit his correspondence to email. Tr. 850. In a phone conversation soon after this exchange, on October 29, 2011, Mr. Johnson tried to dissuade Ryan from going forward with the

**Page 5   BRIEF IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS**

next visit, stating that R did not want to go and "he's not happy," but Ryan insisted the visit proceed. Tr. 852-62.

The text message exchange resumed November 11, 2011. Mr. Johnson offered Ryan "10K to walk away." Tr. 863. This did not go over well, with Ryan responding, "It's nice to know that you think our son our has a payoff sign. You sure have the wrong mindset for [R's] wellbeing. I consider [R] a human being, not a price tag like you Johnsons." *Id.*

The following day, Ryan wrote Mr. Johnson, "15K and it's done." *Id.* Mr. Johnson agreed to this and said he would talk to a lawyer. Tr. 863-64. On November 14, 2011, Ryan texted, "I'm not doing it," telling Mr. Johnson to save his money for R's college education. Tr. 864. Mr. Johnson asked if there was a number Ryan would consider and, after some back and forth, Ryan said he would take twenty thousand dollars cash, "tax free." Tr. 864-65.

After this exchange, Mr. Johnson and Ryan had a long telephone conversation which Ryan recorded, that was played at trial. Initially, it appeared that Ryan would agree to step away from the relationship, or at least from court-supervised contact, with a negotiated monthly payment plan and a new car. Tr. 872-80. The negotiations fell apart when Ryan filed a contempt action against Megan in court. On November 17, 2011, Mr. Johnson texted Ryan,

> If your goal is more time with and a better relationship with [R], that's possible through dialogue negotiation. Your current course of action seems more vindictive than constructive and can only serve to further entrench hostilities. In short it's counterproductive. At some point you need to recognize the difference between what's best for [R] and what's best for Ryan. Hopefully, that will come sooner than later. Everybody's waiting.

Tr. 902.

Ryan responded that Megan "broke the rules" by denying visitation. Tr. 903. Mr. Johnson offered Ryan $5,000 in exchange for his agreement to an additional year of supervised visits,

however Ryan declined. Tr. 904-06. They continued to argue. Then, on November 22, 2011, Ryan told Mr. Johnson, "stop texting me, please." Tr. 909. On November 25, 2011, Ryan told Mr. Johnson that he had "a deal for Megan," and asked him to have her call. Tr. 911.

In December 2011, Fred Genck, a neighbor and friend to the Johnsons, encountered Mr. Johnson while working in his front yard. Tr. 1106. Mr. Johnson approached him and said he was "worried about the safety of Megan and [R] in regards to Ryan." He asked Genck to rent an apartment in his own name "so that they could basically hide from him." *Id*.

On December 31, 2011, following a 911 call by a staff person, Portland Police were dispatched to the Portland Children's Museum regarding an altercation/custody dispute between Megan and Ryan Johnson. Tr. 1130, 1135. Mr. Johnson arrived after the officers, and they asked him to take R to another part of the museum while they talked to Megan and Ryan. Tr. 1132. Although the incident involved "pushing/shoving," no arrest was made, and Megan and Ryan went their separate ways. Tr. 1133-34.

The messages between Ryan and Mr. Johnson resumed in January 2012. On January 1, 2012, Mr. Johnson texted Ryan, "Grow up, be a man and stop hurting [R]." Tr. 911. Then he texted Ryan to offer him "10K," stating, "You're not really ready to be a parent anyway. Do you really want to go through 15 more years of this only to find out [R] doesn't want anything to do with you because you abused him and his mother?" *Id*. Ryan told him to watch his language, stating, "I'm this close to filing harassment on you [sic]." Tr. 911-12. Mr. Johnson responded, "Just telling it like it is. Sorry if you can't handle it but sometimes the truth hurts. Abusive behavior does not [set] a good example for [R]. You really need counseling even if you don't understand that right now." Tr. 912. Ryan told him to "go involve [his] business somewhere

else," to which Mr. Johnson responded, "Protecting my daughter and grandson from abuse is 100 percent my business." *Id*.

They continued to trade insults, then the messages picked up again on January 14, 2012, with Mr. Johnson offering Ryan "50K" and Ryan retorting, "Take that money and do me a favor, stick it right up your ass, you pussy," and "I'm here for the long run, so get used to it. And I'm going to ... always be a dad, you're an ignorant fuck." Tr. 915. Mr. Johnson responded, "You're nowhere near a dad and you'll never be. Just too stupid and immature to realize it, bonehead ... if you weren't such a little bitch you would come and say that to my face chicken shit punk." *Id*. Ryan told Mr. Johnson to "take out [his] anger issues" on his wife; Mr. Johnson implied Ryan was a baby who needed his diaper changed; and Ryan threatened to "call the cops." Tr. 916.

On January 18, 2012, Mr. Johnson sent a long email to Ryan apologizing for his behavior and language and suggesting they try to develop a positive relationship. His stated intent was to deescalate the conflict and improve the circumstances between them for R's benefit. Tr. 1063-65. Ryan did not respond favorably, however, stating again that he was "calling the cops that you leave me alone," and "Jeff, after the bathroom incident where you followed me in, and tried to start conflict with me, I'm asking that you don't call or text, and email me or any third party contact at all under any circumstances at all. This is my final warning." Tr. 916.

Following this, the text exchange ceased. Eight days later, Mr. Johnson shot and killed Ryan.

Mr. Johnson presented an extreme emotional disturbance defense supported by testimony from Dr. Robert Stanulis. Dr. Stanulis asserted that, in addition to immutable characteristics such as age, race, and gender, Mr. Johnson's life choices and values were germane to whether an extreme emotional state was a controlling factor regarding the charged behavior. Tr. 1272. The

**Page 8   BRIEF IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS**

State moved to exclude the portions of Dr. Stanulis' opinion referencing personality traits. Tr. 1239. Defense counsel responded that presenting evidence including Mr. Johnson's life choices, such as his tendency towards compromise, non-violence, and protectiveness of family, would allow the jury "to see this world that Jeff Johnson was experiencing through his eyes." Tr. 1288. He argued that, on the other hand, adopting the State's view would put the jurors

> into an absolutely artificial and untenable world for any psychologist or psychiatrist to give a meaningful and helpful evaluation and expert opinion on the workings of the mind, the emotional state of a person if he cannot describe the organism in the sense that it is intended that one can to give that kind of helpful opinion.

Tr. 1289. He asked the court "not to artificially constrain us so that Dr. Stanulis cannot give any meaningful opinion because he wouldn't be able to describe the human being that he's evaluated and how those factors, those characteristics play out in this equation of how [Mr. Johnson] subjectively saw this situation," explaining that they were asking simply for "the right to present this defense." Tr. 1293, 1303.

Despite making this argument, counsel did not tie these qualities to the statutory framework for extreme emotional disturbance, instead generally arguing that the evidence would help the jury understand "how in the world you go from A to B in a short period of time. How does a person lose control? .... That that person can snap. That person can break. How do you understand EED if you don't know the context in which the actions arise?" Tr. 1294.

The court granted the State's motion and barred Dr. Stanulis from testifying about Mr. Johnson's nonviolence, pacifist beliefs, and core values of protecting his family, conflict avoidance, and compromise. Tr. 1242-43, 1305. Dr. Stanulis accordingly only was able to testify in a limited capacity about the circumstances that led Mr. Johnson to commit the murder.

**Page 9   BRIEF IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS**

He began by describing Megan and Ryan's relationship and the deterioration of that relationship. Tr. 1333-38. He also testified about Ryan's misdemeanor conviction for telephonic harassment involving Megan from March 2011, in which Ryan threatened harm to R and had a shoving match with Megan. Tr. 1338, 1341. On September 30, 2011, there was a trial on the issue of custody before Washington County Circuit Court judge Andrew Erwin, resulting in legal custody being awarded to Megan and supervised visitation for Ryan.[2] Tr. 1338-39.

Dr. Stanulis also described an event on October 8, 2011, when Ryan was late returning R from a visit and Megan got upset and came out to confront him to discover that R was not buckled appropriately into his car seat. Tr. 1339-40. She tried to take a picture, and Ryan pushed her in Mr. Johnson's view. Tr. 1340. As a result of this incident, Megan applied for and received a restraining order against Ryan. Tr. 1341. A Washington County judge granted the temporary restraining order and directed visits take place through Mr. Johnson. Tr. 1342.

Ryan did not respond favorably to this arrangement, which scared Mr. Johnson. *Id*. Mr. Johnson also was frightened and distressed by the fact that Ryan shoved Megan in front of him. Tr. 1340-41. Underlying Mr. Johnson's distress about Ryan's immaturity and volatility was the fact that R had RSV, which Mr. Johnson considered a serious medical disorder requiring proactive attention and care. Tr. 1346. As Mr. Johnson's emotional distress escalated, he began to experience physical symptoms. Tr. 1346. He offered money to Ryan as a way of solving the situation.

However, when the parties appeared before Judge Erwin, the family court judge overseeing the custody dispute, Judge Erwin dismissed the restraining order. Tr. 1356. He was

---

[2] Excerpts of the recorded hearing before Judge Erwin were played for the jury at trial. Tr. at 1236.

not convinced that Mr. Johnson was fearful for Megan's safety because he did not call the police after Ryan pushed her and told Megan and Ryan that the pushing was "not a restraining order incident -- that's two immature really sad excuses [for parents]." *Id*. Rather than intervene, Judge Erwin invited both to "continue acting in the manner that you are and then, see how this thing ends up." Tr. 1357, 1360. He also declined to issue a mutual restraining order, telling the parties he did not wish to see them again until the next scheduled hearing, on January 31, 2012. Tr. 1357-58, 1364.

Mr. Johnson did not take Judge Erwin's ruling well. Tr. 1360. Dr. Stanulis explained that he was "very distressed, because he felt he had now acquired the duty to intervene in this circumstance." *Id*. His physical symptoms of anxiety, including an inability to breathe, worsened. *Id*. He became obsessed with the possibility of domestic violence. Tr. 1360-61.

The telephone harassment conviction was founded in part on a text from Ryan to Megan, "I can harm [R], and you won't even know." Tr. 1362. Mr. Johnson began to believe that Ryan was an imminent deadly threat to his family and to R. Tr. 1361.

Ten days after the hearing, fearful that his family would come to harm, he bought a gun for the first time in his life. Tr. 1361. He believed it was "his job" to intervene to protect his family because "the one person who had the power to do something, the judge, wasn't going to do anything because he did not get it, did not see the level of risk." Tr. 1362.

As the situation with Ryan worsened, Mr. Johnson's emotional overwhelm increased. He felt increasingly scared, depressed, and isolated, believing he was the only person who could solve the problem, but he felt powerless to do so. Tr. 1363. The pushing altercation at the Portland Children's Museum made things substantially worse, increasing his fear for R and his family's safety while cementing his view that he was the person responsible for solving the problem.

**Page 11 BRIEF IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS**

After Ryan met Mr. Johnson's attempt to resolve the situation through a thoughtful and conciliatory email with hostility and the demand that all third-party contact cease and the ominous language, "this is my final warning," Mr. Johnson felt "terrorized." Tr. 1370-71. He feared R's life was literally at risk. Tr. 1371.

On January 26, 2012, Mr. Johnson was in bad shape. He was struggling to breathe and dreading the January 31 hearing, fearing Judge Erwin would "continue with not getting it" and even that the judge was colluding with Ryan. Tr. 1372. He left the house on an errand, but on the way saw Ryan and his half-brother, Austin Putney, driving the opposite direction. Tr. 1372, 1374. Mr. Johnson saw Putney as part of the problem, since Putney had been arrested and served time in prison for hitting a woman with a baseball bat. Tr. 1372-73. Mr. Johnson feared for R's safety in Ryan's home with Putney there and that Ryan would find it easier to commit an act of domestic violence or a drive-by shooting because he lived with someone who had demonstrated the willingness and capability to commit such acts. Tr. 1373.

As Dr. Stanulis described it, upon seeing them, Mr. Johnson's thinking changed, and he shifted from fearfulness to believing he had found a solution. Tr. 1374. He felt dissociated, watching himself think about the mechanics of going up to Ryan and shooting him. Tr. 1374, 1478. He also contemplated shooting himself afterwards, which gave him a sense of relief. Tr. 1374. At that point, he turned his car around, followed Ryan and Putney into the parking lot of the Farmington Thriftway, and shot Ryan to death. Tr. 1478.

Mr. Johnson's friend and former neighbor Gayle Gothe also testified. She said that Mr. Johnson frequently wore all black, including black beanies and black gloves, like on the day of the homicide. Tr. 1419. Gothe was aware of the situation with Ryan and said that Mr. Johnson had expressed his fear for R and Megan's safety to her. Tr. 1422. She also said that Mr. Johnson

had a close relationship with R, like a surrogate father. Tr. 1435-36. The last time she interacted with Mr. Johnson, she described him as "very distraught -- more distraught than [she] had ever seen him before, "worried about the safety [of] his daughter, his family and his grandson," and fearful that they were in danger. Tr. 1422-23, 1430.

Another friend and neighbor, Earl Flemming, said that Mr. Johnson's relationship with [R] was "nurturing and a priority," in that he prioritized time with his grandson over other activities. Tr. 1445. He also testified that Mr. Johnson routinely wore all black. Tr. 1445-46.

The State presented a rebuttal case, calling Detective Gary Jensen to testify that Ryan's mother, Melissa Davis, worked in the sporting goods section of the Bi-Mart in Aloha, which also sold guns and gun oil. Tr. 1505. The Bi-Mart in Aloha was significantly closer to the Johnsons' home than the Bi-Mart in Beaverton, where Mr. Johnson purchased the gun oil. The State did not call Davis herself to testify or introduce evidence that Mr. Johnson knew that Davis worked there. Mr. Johnson's counsel did not object to Jensen's testimony.

In closing argument, the State contended that Mr. Johnson did not act under an extreme emotional disturbance, but rather made a premeditated choice to murder Ryan to save his family from "15 years of custody issues" and that he was "hunting Ryan Johnson that day." Tr. 1591-1601, 1656. The State connected his purchase of the gun oil to his intent, contending he wanted to ensure the Bersa would not jam. The State argued, "You want to be able to empty the clip to make sure you kill your target. And that's possibly what is most telling about Mr. Johnson's intent, the multiple shots, the manner in which he killed Ryan Johnson." Tr. 1598.

To further support its contention that Mr. Johnson planned to commit the homicide, the State argued that Mr. Johnson went to Beaverton Bi-Mart for gun oil, although the Aloha Bi-Mart was significantly closer to his home, to avoid encountering Ryan's stepmother: "What else

**Page 13 BRIEF IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS**

do we know about that Aloha Bi-Mart, the one that's closer to his house? Well, we know Ryan Johnson's step-mom, Melissa Davis, works there. Not only does she work at the Aloha Bi-Mart, but she works in the sporting goods section where they sell gun oil." Tr. 1584.

The jury convicted Mr. Johnson as charged, rejecting his extreme emotional disturbance defense. Tr. 1673. The court sentenced him to life imprisonment with a minimum term of 25 years. Tr. 1711.

### III.     Direct Appeal And Post-Conviction Proceedings.

Mr. Johnson filed a direct appeal in which he challenged (1) the exclusion of the evidence of his history of pacifism and law-abiding nature, inclination towards compromise, and protectiveness of his family and (2) the admission of gruesome autopsy photographs. Resp. Ex. 103. The court of appeals issued a published opinion concluding that Mr. Johnson's trial counsel failed to preserve an argument that the contested evidence of Mr. Johnson's personality traits was admissible on the first, subjective prong of the extreme emotional disturbance statute, Or. Rev. Stat., § 163.135, which requires the factfinder to consider whether Mr. Johnson committed the crime under the influence of an extreme emotional disturbance. *State v. Johnson*, 288 Or. App. 528, 530 (2017); Resp. Ex. 105 at 3. Mr. Johnson petitioned for review only of the second issue, and the Oregon Supreme Court denied review. Resp. Exs. 106; 107.

In post-conviction proceedings, Mr. Johnson argued and exhausted claims of ineffective assistance of counsel relating to his counsel's presentation of the extreme emotional disturbance defense, failure to object to certain jury instructions and request others, failure to object to Jensen's testimony in the State's rebuttal case, and cumulative error. Resp. Ex. 110. The State presented a declaration from trial counsel in which he asserted that he did not object to Jensen's testimony because it was "proper" rebuttal and relevant, that the evidence of Mr. Johnson's

temperament and history of nonviolence were relevant to both the first and third prongs of the extreme emotional disturbance defense, and that there was no basis to object to the jury instructions. Resp. Ex. 124. The court issued a written judgment denying relief. Pertinent here, with respect to each claim of ineffective assistance of counsel, the court found that counsel's "testimony" was credible, that his choices were founded on strategic judgments, and that Mr. Johnson had not demonstrated prejudice. Resp. Ex. 127 at 4-8.

Mr. Johnson appealed the post-conviction court's denial of relief regarding counsel's failure to object to Detective Jensen's rebuttal testimony, counsel's failure to make and preserve arguments for admissibility of evidence of Mr. Johnson's relevant personal characteristics under the first prong of the statute, and failure to object to the court's jury instructions on the extreme emotional disturbance defense. Resp. Ex. 128. The court of appeals affirmed without opinion and the Oregon Supreme Court denied review. Resp. Exs. 130 at 24; 131.

## IV.    Habeas Corpus Proceedings

Mr. Johnson filed a timely petition for writ of habeas corpus. ECF 2. The court subsequently appointed counsel, who filed an amended petition for writ of habeas corpus. ECF 11; 29. In response, the Respondent contends that certain claims in the amended petition are procedurally defaulted because not exhausted. ECF 36 at 7-9. The Respondent is correct regarding Mr. Johnson's Ground I and Ground III(A) claims, and Mr. Johnson accordingly does not pursue these claims further. Mr. Johnson also does not pursue his Ground II claim concerning the admission of the autopsy photographs.

As argued below, Mr. Johnson did exhaust the claims of ineffective assistance of counsel regarding his lawyer's failure to except to certain jury instructions and propose others (Grounds III(E) and (F)) by urging the Oregon Supreme Court to review the claims and incorporating

arguments from his appellate brief under *Farmer v. Baldwin*, 346 Or. 67, 205 P.3d 871 (2009). Mr. Johnson further argues that the state court's merits decisions unreasonably applied clearly established federal law and unreasonably determined the facts. Because the errors, considered separately and cumulatively, probably affected the outcome, the Court should grant the petition for writ of habeas corpus.

## V.    Argument in Support of Petition for Writ of Habeas Corpus

### A.    Mr. Johnson Was Denied His Sixth Amendment Right To Effective Assistance Of Counsel By His Lawyer's Failure To Object To Or Move To Strike Rebuttal Evidence That Lacked A Proper Foundation.

Mr. Johnson's lawyer unreasonably failed to object to Detective Jensen's rebuttal testimony about Mr. Johnson's purchase of gun oil from the Aloha Bi-Mart, where Ryan's stepmother Melissa Davis worked in the sporting goods department, rather than the Beaverton Bi-Mart closer to Mr. Johnson's home. The State did not (a) call Davis herself to testify or (b) prove that Mr. Johnson knew she worked there. The State relied on this evidence as circumstantial proof that Mr. Johnson intentionally killed Ryan, corroborating its theory that he planned the killing in advance and bought the gun oil so the Bersa would not jam. Tr. 1598. Counsel's omission was ineffective under the Sixth Amendment.

#### 1.    An Accused Person Is Guaranteed The Right To Effective Assistance Of Counsel.

The Sixth Amendment right to counsel safeguards the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The *Strickland* standard is a two-pronged test requiring proof of deficient performance and prejudice. To show counsel was deficient, a petitioner must establish that counsel's performance fell below an "objective standard of reasonableness" under prevailing professional norms. *Id.* at 687–88. This analysis requires a

court to begin by presuming that counsel's representation was reasonable. *Id*. at 689. The court should try to "reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id*. at 690. The prejudice prong requires the court to find "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

Because of the presumption that counsel performed competently, in habeas corpus cases under the AEDPA, the *Strickland* analysis is described as "doubly deferential." *See Premo v. Moore*, 562 U.S. 115, 122 (2011). This refers not to a heightened standard of deference to counsel's performance, but rather the two layers of deference accorded a *Strickland* claim in federal habeas corpus. First, the court accords deference to the state court's merits decision under 28 U.S.C. § 2254(d). But if a habeas petitioner demonstrates that a state court's decision was objectively unreasonable, the federal court reviews the *Strickland* question *de novo*, ascribing counsel's decisions the ordinary *Strickland* presumption. *See Wiggins v. Smith*, 539 U.S. 510, 531 (2003).

> **2.    The Post-Conviction Court's Finding That Mr. Johnson's Lawyer Reasonably Believed The Evidence Was Relevant And Admissible Unreasonably Applied *Strickland* And Unreasonably Determined The Facts.**

Mr. Johnson challenges his lawyer's failure to object to or move to strike inadmissible rebuttal testimony regarding Davis's employment at the Aloha Bi-Mart, which the State relied on to argue that Mr. Johnson purposefully chose to go to the Beaverton Bi-Mart to avoid her. The only evidence the State presented to support this inference was from Detective Jensen, who testified that he "got to know" Davis during the investigation and that, in January 2012, Davis

was working at the Bi-Mart in Aloha, in the sporting goods section. Tr. at 1504-05. Although

counsel objected on relevance grounds to a question about Jensen getting to know Davis, he made

no further objection when Jensen testified about her place of employment. *Id*.

Jensen's testimony was inadmissible for two reasons: first, the State did not present

evidence that Mr. Johnson knew that Davis worked there. Second, the testimony that Davis

worked in the Sporting Goods section of the Bi-Mart in Aloha was hearsay. *See* Or. Rule. Evid.

801(3); 802. Yet, counsel did not object to or move to strike the evidence.

The post-conviction court nevertheless found that Mr. Johnson's lawyer's lack of

objection was reasonable on the basis that the evidence was "relevant and admissible":

> While there was no specific evidence demonstrating [Mr. Johnson] knew Ryan's
> … stepmother worked at Bi-Mart, it would be a fair inference that petitioner knew
> this information, because [Mr. Johnson] had essentially a father/son relationship
> with Ryan during the year or so that Ryan lived in the Johnson family home. It
> was relevant and admissible for the State to put on evidence that Melissa Davis
> worked at the Aloha Bi-Mart.

ECF 127 at 5. The court also found that this was relevant rebuttal evidence to Dr. Stanulis's

testimony about Mr. Johnson's emotional state before the shooting. *Id*. at 6.

The post-conviction court's speculation about what the jury could fairly infer from

Mr. Johnson's "father/son relationship with Ryan" during the time that Ryan lived in the Johnson

home unreasonably determined the facts under 28 U.S.C. § 2254(d)(2).

The Ninth Circuit has explained that an unreasonable factual determination under

§ 2254(d)(2) occurs when a state court misapprehends or misstates the record, ignores facts that

support a habeas petitioner's claim, or fails to consider key aspects of the record. *Kipp v. Davis*,

971 F.3d 939, 953-54 (9th Cir. 2020) (citing *Taylor v. Maddox*, 366 F.3d 992, 1000-01 & 1008

(9th Cir. 2004)); *compare Martin v. Grosshans*, 424 F.3d 588, 591 (7th Cir. 2005) (finding state

court's determination that counsel was not deficient for failing to object to inadmissible evidence proffered to show consciousness of guilt unreasonable).

The post-conviction court's factual determination that the jury could fairly infer from Mr. Johnson's prior relationship with Ryan that he would have known where Davis worked was unreasonable under this standard.

The trial evidence established that Ryan moved in with the Johnsons in approximately March 2007, while he was a junior in high school. Tr. at 1333. He moved out of their home sometime in 2008, after R was born. Tr. at 1417. The homicide took place on January 26, 2012.

The State did not establish how long Davis had worked at the Bi-Mart or present evidence that Davis worked there when Ryan was living in the Johnson home and Mr. Johnson supposedly had a close relationship with Ryan. Moreover, when Ryan left, his relationship with the Johnsons swiftly deteriorated, culminating in his prosecution for misdemeanor harassment and court-ordered supervised visitation. Tr. 1338-39. At the time of the homicide Ryan and Mr. Johnson communicated minimally and with hostility.

It must be remembered that Ryan had a strained relationship with his own family and had moved out because of strife in his household, where "the parental relationship had broken down to the point that he had been asked to leave." Tr. 1334-35. Given this estrangement, even assuming Ryan was close to Mr. Johnson when he was living with the Johnsons, it is far from clear that Mr. Johnson would have known where Davis worked, even if the State had shown she was working at the Bi-Mart during that time.

These circumstances demonstrate that the post-conviction court unreasonably determined the facts in finding it was a "fair inference" that Mr. Johnson knew where Davis worked in January 2012. The post-conviction court overlooked or ignored the significant time that had

elapsed between when Ryan had moved out of the Johnson home and the homicide. The court also ignored the evidence that, for a significant time leading up to the homicide, Mr. Johnson's communication with Ryan was extremely limited. This communication concerned the custody issues, not Ryan's parents' employment. Without proof that Mr. Johnson knew where Davis worked, there was no relevant connection between the homicide and Mr. Johnson's purchase of gun oil at the Aloha Bi-Mart, rather than the Beaverton location. The State's rebuttal evidence was not relevant or admissible.

The evidence also was inadmissible because it was hearsay. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 413 (2000); *see Means v. Horel*, 805 F. Supp. 2d 1013, 1022 (E.D. Cal. 2011) (finding state court unreasonably applied *Strickland* where court "did not address in any depth the issues of whether the hearsay statements should have been objected to and excluded based on evidentiary rules" and "as every lawyer knows, hearsay is inadmissible unless an exception applies");*see also Wilson v. Laney*, 317 Or. App. 324, 333-34 (2022) (finding counsel performed deficiently in failing to object to hearsay).

Oregon Evidence Rule 801 provides that "hearsay" is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Or. Evid. R. 801(3). Jensen's testimony about where Davis worked in January 2012 was hearsay, since he learned this information from Davis, who did not testify, and the evidence was offered for its truth. Thus, even without considering the lack of evidence showing that Mr. Johnson knew Davis worked at the Aloha Bi-Mart, the evidence also was

inadmissible hearsay. The post-conviction court unreasonably applied *Strickland* in failing to consider the application of state hearsay rules.

### 3.    Reasonably Competent Defense Counsel Would Have Objected To Inadmissible Evidence That Undermined The Defense Theory.

Where a state court's merits decision unreasonably applies federal law or is based on an unreasonable factual determination, AEDPA deference no longer applies. *Panetti v. Quarterman*, 551 U.S. 930, 953-54 (2007); *Kipp*, 971 F.3d at 955. As shown, the post-conviction court's fact-finding process here was "not adequate for reaching reasonably correct results," *Panetti*, 551 U.S. at 954, and unreasonably applied *Strickland*. This Court thus reviews Mr. Johnson's ineffective-assistance-of-counsel-claim *de novo*. *Id*.

The Ninth Circuit recognizes that a trial lawyer's failure to object to inadmissible evidence may constitute ineffective assistance of counsel. *Dixon v. Baker*, 847 F.3d 714, 722–23 (9th Cir. 2017). A claim of "trial strategy" does not insulate a lawyer from *Strickland* review. *Roe v. Flores–Ortega*, 528 U.S. 470, 481 (2000). "The relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Id*. A poor tactical decision will be deficient conduct if "the defendant [can] overcome the presumption that, under the circumstances, the challenged action [or lack of action] 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689.

Here, counsel explained that he did not object to Jensen's testimony because he believed it was "proper" rebuttal evidence. ECF 124 at 2. As shown, the evidence was hearsay, and the State presented no evidence that Mr. Johnson knew where Davis worked, which was essential for it to be relevant to rebut the defense. Thus, even if counsel chose not to object for strategic

reasons, his omission was unreasonable because it was founded on the mistaken belief that the evidence was admissible.

Moreover, there was no strategic downside to objecting. Counsel recognized that the State elicited the evidence to prove that Mr. Johnson's actions were "planful, deliberate, and intentional." ECF 124 at 2. Therefore, counsel understood that the State sought to undermine Mr. Johnson's extreme emotional disturbance defense. Had counsel objected, at worst, the court may have overruled the objection, preserving an issue for appeal. Or, the State may have tried to present evidence to establish the required nexus that Mr. Johnson knew Davis worked at the Aloha Bi-Mart.

It is far from clear that the State would have been able to do so, however. The State did not present such evidence at trial. Although this would have been an easy way to defeat Mr. Johnson's ineffective assistance of counsel claim, the State also did not present such evidence in the post-conviction proceedings despite introducing police reports containing statements from Davis. Resp. Ex. 123. This Court should conclude that reasonably competent defense counsel, even believing evidence proffered by the State was potentially relevant, would have made appropriate objections based on admissibility.

### 4.    Mr. Johnson Was Prejudiced By His Lawyer's Omission.

This Court should also conclude that counsel's deficient performance prejudiced Mr. Johnson. The evidence went to the heart of Mr. Johnson's extreme emotional disturbance defense. If counsel had made a timely and specific objection based on relevance and hearsay, the objection would likely have been sustained and the evidence would have been stricken. Without an objection, however, the State could argue that this evidence supported planning and premeditation, dovetailing with its theory that Mr. Johnson was "hunting" Ryan. Tr. 1584. This

**Page 22 BRIEF IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS**

Court should conclude that if the jury had not been encouraged to infer that Mr. Johnson purchased gun oil at a Bi-Mart far from his home because he already had decided to kill Ryan, there is a reasonable likelihood that the outcome of the case would have been different, establishing *Strickland* prejudice.

**B.    Mr. Johnson Was Denied His Sixth Amendment Right To Effective Assistance Of Counsel By His Lawyer's Failure To Preserve Or Make Proper Arguments For The Admissibility Of Evidence Essential To His Extreme Emotional Disturbance Defense.**

Mr. Johnson also was denied his Sixth Amendment right to effective assistance by his lawyer's failure to research and understand the statute underlying his client's defense. A defense attorney's failure to research points of law that are important to the case "is a quintessential example of unreasonable performance under *Strickland*." *Hinton v. Alabama*, 571 U.S. 263, 274 (2014). Applying *Strickland*, the Ninth Circuit has repeatedly found deficient performance where counsel failed to research or comprehend legal points essential to the client's defense. *See e.g. Hernandez v. Chappell*, 923 F.3d 544, 550 (9th Cir. 2019) (finding deficient performance based on counsel's ignorance of law of diminished capacity, which was defendant's "best possible defense"); *Morris v. California*, 966 F.2d 448, 454–55 (9th Cir. 1991) (finding counsel's performance deficient because he had not "done his homework" in researching the relevant law).

**1.    The Post-Conviction Court Unreasonably Applied Federal Law And Unreasonably Determined The Facts In Ruling That Counsel Performed Competently Despite His Failure To Advance And Preserve Arguments For The Admissibility Of Evidence Of Mr. Johnson's Pacifism, Inclination Towards Compromise, And Protectiveness Of Family.**

The PCR court found that defense counsel was following "a well-traveled and reasonable path" when he tried to persuade the trial court to allow him to introduce evidence of Mr. Johnson's "pacifism, history of non-violence and conciliation, his role as protector of the

family, and his inability to freely reveal his feelings as 'personal characteristics' that were pertinent to [Mr. Johnson's] 'situation' and relevant for the jury to consider in deciding whether" an ordinary person in his circumstances "would have experienced an extreme emotional disturbance and been unable to refrain from committing a homicide." Resp. Ex. 127 at 7-8. The court further found that counsel "correctly recognized that he did not have the option of only trying to get subjective evidence into the record as to the first prong, *i.e.*, on the issue of whether the defendant experienced an extreme emotional disturbance." *Id*. at 8. The court accordingly concluded that counsel's strategy of arguing for admissibility of the evidence under both the first and third prongs was "reasonable, if unsuccessful." *Id.* The PCR court's ruling unreasonably applied clearly established federal law and unreasonably determined the facts because the court excused or overlooked counsel's apparent failure to research and understand the law as it pertained to the central issue in the case. 28 U.S.C. § 2254(d)(1); (2).

Oregon's extreme emotional disturbance defense stems from an effort to codify the common-law "heat of passion" defense. *State v. Ott*, 297 Or. 375, 380-87 (1984). In enacting the statute, the legislature sought to eliminate a temporality restriction that limited the availability of the defense to sudden provocation, as well as expand the kinds of evidence that would be admissible to establish the defense at trial. *Id*. at 387-89. At the same time, the legislature sought to balance the objective "ordinary person" standard against the relevance of subjective elements. Thus, the statute directs the factfinder to judge the reasonableness of the extreme emotional disturbance from the standpoint of "the actor's situation under the circumstances as the actor reasonably believes them to be." *Id*. at 394; *See* Or. Rev. Stat. § 163.135(1).[3] As the Court in *Ott*

---

[3] The statute provides:

explained, precluding a defendant from presenting evidence of his personal characteristics (the subjective component) leads to anomalous results because the factfinder does not hear relevant evidence, increasing the likelihood of unjust conviction of the greater charge. *Id*. at 394-95.

Although the court in *Ott* held that the legislative history does not support the admission of "personality traits," such as whether a person is "bad-tempered" or "even-tempered," at the same time, the court recognized that factors that do not fall neatly into the category of "personal characteristics" may nevertheless be admissible. *Id*. at 395-96. For example, the court cited with approval a hypothetical of an Asian-American with a history of internment in a concentration camp who kills a coworker after being "roused to the heat of passion by racial slurs." *Id*. at 395. There, both the person's race and "previous experience of racial discrimination" would be admissible. *Id*.

Subsequently, in *State v. Counts*, the Oregon Supreme Court elaborated on the statutory analysis, with particular emphasis on the subjective versus objective components. 311 Or. 616, 622-23 (1991). The court began by describing the three components of an extreme emotional disturbance defense: "(1) Did the defendant commit the homicide under the influence of an extreme emotional disturbance? (2) Was the disturbance the result of the defendant's own

_____

It is an affirmative defense to murder in the second degree for purposes of ORS 163.115(1)(a) that the homicide was committed under the influence of extreme emotional disturbance if the disturbance is not the result of the person's own intentional, knowing, reckless or criminally negligent act and if there is a reasonable explanation for the disturbance. The reasonableness of the explanation for the disturbance must be determined from the standpoint of an ordinary person in the actor's situation under the circumstances that the actor reasonably believed them to be. Extreme emotional disturbance does not constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime.

intentional, knowing, reckless, or criminally negligent act? (3) Was there a reasonable explanation for the disturbance?" *Id*. at 623.

The court explained that the first prong of the analysis is "purely subjective," requiring the defendant to prove that he or she "'acted under' an *emotional* disturbance." *Id*. (emphasis in original). The third prong requires the reasonableness of the explanation to be determined from the standpoint of an ordinary person in the actor's situation, "under the circumstances as the actor reasonably believes them to be." *Id*. at 626; Or. Rev. Stat. § 163.135(1). Thus, in contrast to the first prong of the analysis, the third prong is "purely objective," requiring the defendant to prove "that there was a '*reasonable* explanation' for the disturbance." *Id.* (emphasis in original). The Respondent thus incorrectly frames the analysis in contending that the "third element … combines both objective and subjective tests." *See* Response to Amended Petition for Writ of Habeas Corpus (hereafter "Response")*, ECF 36 at 16.

Given this case law, it was unreasonable for the post-conviction court to conclude that counsel "correctly recognized that he did not have the option of only trying to get subjective evidence into the record as to the first prong, *i.e.*, on the issue of whether the defendant experienced an extreme emotional disturbance." Resp. Ex. 127 at 8. To the contrary: *Counts* had made this distinction explicit. In opposition to the post-conviction court's finding, given the unambiguous language in *Counts*, reasonable defense counsel presenting an extreme emotional disturbance defense would have been familiar with the case law, understood the difference between a "purely subjective" versus a "purely objective" standard, and structured his arguments accordingly.

**Page 26 BRIEF IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS**

**2.      Counsel Deficiently Failed To Argue For Admission Of The Evidence Under The First, Subjective Prong Of The Extreme Emotional Disturbance Defense.**

"When a state court's adjudication of a claim is dependent on an antecedent unreasonable application of federal law, the … federal court must then resolve the claim without the deference AEDPA otherwise requires." *Panetti*, 551 U.S. at 953.

Trial counsel's argument in his written motion *in limine* cited case law solely to explain how Dr. Stanulis's opinions would conform to restrictions set by Oregon cases. Resp. Ex. 135. Then, at trial, the State moved to exclude evidence of Mr. Johnson's pacifism, nonviolence, protectiveness of family, and inclination towards conflict. Although counsel presented impassioned arguments that the evidence the State sought to prohibit was essential to Mr. Johnson's defense, counsel minimally addressed Oregon case law and did not cite *Counts*. Tr. at 1240. In his declaration prepared for the post-conviction proceedings, trial counsel insisted that Mr. Johnson's pertinent personal characteristics "were relevant to both prongs 1 and 3." Resp. Ex. 124 at 2. As demonstrated, counsel's belief evinces a misunderstanding of the case law and the nature of the defense.

In *Counts*, the court's extensive analysis of the statute's legislative history focused on statutory amendments that added objective language requiring the circumstances to be considered from the standpoint of an "ordinary person." 311 Or. at 628. The court explained that the legislature "intentionally maintained [] objective checks [] in the defense," so that, for example, a jury would not be obligated to consider the defendant's actions from the standpoint of "an ordinary insane person." *Id*. at 628-29.

> Under the first component of [an extreme emotional disturbance] defense, the trier of fact asks and answers whether the defendant was, in fact, acting under the influence of an extreme emotional disturbance. If the trier of fact answers that the

defendant was so disturbed…, then under the third component the trier of fact determines whether, under the circumstances, an ordinary person, with certain characteristics of the defendant (excluding insanity) would have been extremely emotionally disturbed.

*Id.*

 This explanation makes clear that the threshold question whether Mr. Johnson was "in fact" acting under the influence of an extreme emotional disturbance is the only subjective part of the inquiry. While the third prong references the standpoint of the defendant, this analysis is subsumed within an objective reasonableness standard. "[T]he jury must determine what was the defendant's situation in the circumstances which the defendant *reasonably* believed to exist." *Ott*, 297 Or. at 398 (emphasis added). Having found the accused satisfied the factual threshold of causation in fact between the extreme emotional disturbance and the homicide, the jury would have to find the defendant's beliefs reasonable.

Reasonably competent defense counsel would have researched and understood this case law and advocated for admission of Mr. Johnson's unique personal characteristics only under the first, subjective prong. Defense counsel did not do so here. Although counsel fervently argued for admission of the evidence, it is apparent that he failed to appreciate the structural requirements of the statute and how these limited the way that the evidence could be considered. Indeed, his declaration makes this plain, in that he hoped to establish that Mr. Johnson was "a reasonable person, not a provocative hothead"—the precise approach forbidden under *Ott*. *See Ott*, 297 Or. at 395-96 (barring evidence of whether a defendant is "bad-tempered" or "even-tempered").

"An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*." *Hinton*, 571 U.S. at 274. To be sure, not all of the aspects of

Mr. Johnson's personality that Dr. Stanulis believed important to his behavior may have been admitted. However, without understanding how the Oregon courts had analyzed the question, defense counsel's efforts were virtually doomed to failure. Consider the hypothetical of the Japanese-American who had been in a concentration camp who commits a homicide after being subjected to a racial slur. This person's experiences shaped his personality and explain his reaction to a racial slur.

So too with Mr. Johnson. A reasonably competent defense attorney would have tied the features of Mr. Johnson's personality that were relevant to his perception of the situation to his history and argued for admissibility under the first prong. Trial counsel did not do this. This Court should conclude that trial counsel's performance fell below prevailing professional norms.

### 3. Mr. Johnson Was Prejudiced By His Lawyer's Deficient Performance.

As noted, prejudice requires a reasonable probability of a different result. *Strickland*, 466 U.S. at 694. The Respondent contends that Mr. Johnson was not prejudiced because the evidence would have been inadmissible. Response, ECF 36 at 17. However, it is impossible to divorce the question of admissibility from counsel's basic ignorance of the law.

The best arguments for admissibility of evidence of Mr. Johnson's pacifism, nonviolence, inclination towards compromise, and protectiveness of family would have made it clear that these were not life choices but rather fundamental features of his character. The best arguments for admissibility would have demonstrated that Mr. Johnson's behavior in shooting Ryan represented a radical deviation from his fundamental character, such that only an extreme emotional disturbance could explain the homicide. Reasonably competent counsel would have

anticipated the potential pitfalls presented by this exceedingly complicated defense and structured his arguments accordingly.

Without this evidence, the State was able to argue, essentially unrebutted, that Mr. Johnson started planning the homicide when he bought the gun and "executed" Ryan to save his daughter from 15 years of custody issues. Tr. 1591-1601. This Court should conclude that, but for counsel's deficient failure to research and present adequate arguments for admission of the evidence, there is a reasonable probability the outcome of the trial would have been different.

### C.    Mr. Johnson's Lawyer Was Ineffective For Failing To Object To Jury Instructions That Increased The Defense Burden Of Proving An Extreme Emotional Disturbance And Failing To Request Instructions Necessary For A Proper Determination Of The Legal Defense.

Mr. Johnson's counsel also was ineffective for failing to object to jury instructions that misstated the law and increased the defense burden of proving an extreme emotional disturbance and failing to propose correct jury instructions. The State asserts that this claim is procedurally defaulted, but the State is mistaken. Mr. Johnson's appellate counsel exhausted this claim by urging the court to review it in his petition for review and incorporating the arguments in his appellate brief by reference, as authorized under Oregon law.

#### 1.    Under Oregon Law, Mr. Johnson's Appellate Counsel Exhausted Mr. Johnson's Ground III(E) And (F) Claims By Advocating For Review, Citing *Farmer v. Baldwin*, And Incorporating By Reference His Arguments On Appeal.

A habeas petitioner satisfies the exhaustion requirement of 28 U.S.C. § 2254(b)(1)(A) if he fairly presents his habeas claims to the state's highest court. *Picard v. Connor*, 404 U.S. 270, 275 (1971); *see also Duncan v. Henry*, 513 U.S. 364, 365 (1995). Fair presentation is a question of state law, requiring petitioners to fairly present their claims "in the manner required by the state courts, thereby 'afford[ing] the state courts a meaningful opportunity to consider allegations

of legal error.'" *Casey v. Moore*, 386 F.3d 896, 915–16 (9th Cir. 2004) (quoting *Vasquez v. Hillery*, 474 U.S. 254, 257 (1986)) (alteration in original).

On appeal of the post-conviction court's judgment dismissing the petition to the Oregon court of appeals, in addition to presenting extensive argument regarding counsel's failure to make and preserve arguments for the admissibility of certain evidence regarding Mr. Johnson's personal characteristics, appellate counsel included arguments regarding counsel's failure to except to the jury instructions issued by the court and to request proper instructions for the extreme emotional disturbance defense. ECF 128 at 40-42. In the petition for review, although counsel truncated his presentation, he specifically urged the court to "allow review to address the issue of whether trial counsel was ineffective for failing to request appropriate jury instructions to support the theory of defense." ECF 130 at 19. For his argument, counsel noted, "Petitioner relies on the arguments presented in the brief in the Court of Appeals. *Farmer v. Baldwin*, 346 Or 67, 73-74, 205 P3d 817 (2009)." ECF 130 at 21.

The Respondent contends that Mr. Johnson's Ground III(F) claim is procedurally defaulted, ECF 36 at 9, but Respondent's argument mistakes the record and fails to account for Oregon law regarding exhaustion. In *Farmer,* the Ninth Circuit certified to the Oregon Supreme Court the following question:

> Whether, under its rules or practice, the Oregon Supreme Court would deem a federal question not properly raised before it, when that question has been presented by means of an attachment to a *Balfour* brief filed in the Court of Appeals, and the attachment served as (but was not labeled as) Section B of said brief, and the petitioner specifically states in his petition to the Supreme Court that his reasons for seeking review are set forth in the *Balfour* brief.

356 Or. at 71-72.

The court began by clarifying that whether a claim presented a federal question was a question of federal law. But the court answered in the affirmative the question whether the claims had been presented in a manner that would allow discretionary review. *Id.* at 73, 205 P.3d 871. Relevant here, the court rejected the State's argument that a petition for review may not incorporate appellate briefs by reference, holding that, "[a]t a minimum, the [Oregon Rules of Appellate Procedure] contemplate that a petitioner may raise arguments by incorporating those arguments from his or her appellate brief into the petition for review." *Id.* at 73-74, 205 P.3d 871; *see also id.* at 80, 205 P.3d 871 ("petitioner's incorporation by reference of arguments from his appellate brief is a permissible method of raising an issue in this court."). Indeed, the court pronounced this "the best way" for a petitioner to rely on legal arguments made in the court of appeals. *Id.* at 74; *see also Carrillo-Carrillo v. Coursey*, 823 F.3d 1217, 1220-22 (9th Cir. 2016) (deferring to *Farmer*'s exposition of state law regarding exhaustion of claims).

Under *Farmer*, counsel's incorporation by reference was an entirely proper way to present and exhaust claims for review. Since Mr. Johnson fully briefed his ineffective-assistance-of-counsel claims regarding the jury instructions in the Oregon court of appeals and his lawyer both referenced the claims and cited to *Farmer* in relying on the arguments presented in that court, ECF 130 at 19-21, these arguments were incorporated by reference in the petition for review.

In similar circumstances, courts in this district have found that appellate counsel's citation to *Farmer* and explicit incorporation by reference of appellate arguments suffices to exhaust claims under Oregon law. *See e.g. Clegg v. Premo*, No. 6:15-CV-01661-MK, 2021 WL 11141284, at *5 (D. Or. Apr. 21, 2021) (holding that a petitioner's incorporation of appellate briefing under *Farmer* provides Oregon's highest court "a fair opportunity" to review the merits

of the incorporated arguments and "reinforces the principle of comity underlying exhaustion"); *Bardales v. Howton*, No. 6:07-cv-06358-AA, 2010 WL 3866716, at *3 (D. Or. Sept. 26, 2010) (explaining that "*Farmer* explicitly rejected the State's contention that the Oregon Supreme Court 'will not scour the petitioner's Court of Appeals briefs as part of its consideration of the petition for review'"). This Court should conclude that Mr. Johnson's Ground III(E) and (F) claims were exhausted through counsel's incorporation of his arguments by reference in the appellate brief.

> **2. Trial Counsel's Failure To Object To The Court's Instruction That Erroneously Increased Mr. Johnson's Burden Of Proof Regarding The Extreme Emotional Disturbance Defense And To Propose Accurate Instructions Was Deficient Performance That Prejudiced Mr. Johnson.**

Or. Rev. Stat. § 163.135(1) provides an affirmative defense to murder where the murder was a result of an extreme emotional disturbance "and if there is a reasonable explanation for the disturbance." Notwithstanding this statutory language, at trial, the court instructed the jury that, after determining the situation they believed Mr. Johnson found himself in, "you must determine whether an ordinary person in that situation would have experienced such extreme emotional disturbance that he would have lost the capacity to control himself and *forego the homicide*." Resp. Ex. 118 at 6 (emphasis added). Mr. Johnson's trial counsel did not except to this instruction.

The instruction derives from the Oregon Supreme Court's decision in *Ott*:

> We conclude that in instructing a jury on the meaning of the term "extreme emotional disturbance" a trial court, after proper instruction as to the burden of persuasion, should pose the issue in terms of whether defendant was under the influence of an emotional disturbance to the extent that he lost his self-control that would have otherwise prevented his committing the homicide.

*Ott*, 297 Or. at 393.

However, as shown, although this instruction was patterned on *Ott*, it incorrectly increased the burden on accused persons asserting they committed a homicide because of an extreme emotional disturbance by requiring them to show not merely that the disturbance was reasonable, but that the disturbance prevented the accused from controlling his actions and foregoing the homicide. As argued in the PCR trial court, it was incumbent on trial counsel to review the statute, take exception to any instruction that increased the defense burden of proof, and propose instructions that accurately reflected the legal standard. Resp. Ex. 111 at 38.

An accused person is entitled to jury instructions that accurately state the law and entitle him to argue his defense theory to the jury. *Mathews v. United States*, 485 U.S. 58, 63 (1988); *Hennessy v. Goldsmith*, 929 F.2d 511, 514 (1991) (citing *In re Winship*, 397 U.S. 358 (1970)). In his declaration submitted in the post-conviction proceedings, trial counsel averred that he "had no basis to object to the instruction," believing it to be "an accurate statement of the law." Resp. Ex. 124 at 3. The post-conviction court agreed with this assessment, citing *Counts*. Resp. Ex. 127 at 7. But the court in *Counts* explained that the first prong of the extreme emotional disturbance defense requires the defense to establish only that the defendant committed the homicide "under the influence of an extreme emotional disturbance," and that there was a reasonable explanation for the disturbance, not that the defendant was unable to control his behavior and forego the homicide. 311 Or. at 623. Thus, the post-conviction court's determination that counsel had no duty to advocate for an instruction that accurately framed the defense burden, notwithstanding *Ott*, was unreasonable.

Given the unusual case facts, excepting to the court's instruction and requesting an instruction that tracked the statutory language was particularly important. As trial counsel admitted, "the fact pattern of this case was not of a classical single, overwhelming 'heat of

passion' event. Instead, it was the drip, drip, drip situation described by Dr. Stanulis as catathymia." Resp. Ex. 124 at 3. As described by Dr. Stanulis, when Mr. Johnson committed the shooting after months of accumulating stress, he felt dissociated and thought he had found "a solution" to the threat he believed Ryan posed to his family. Contrasted to a scenario involving an accused person overwhelmed by emotion in response to a sudden provocation, it would have been exceedingly difficult for the jury to find that Mr. Johnson was "unable to forego" the homicide. After all, they may have reasoned, he had managed to forego committing a homicide for the past three months despite significant provocation from Ryan.

This Court should conclude, therefore, that counsel's failure to (a) except to the court's instruction and (b) propose jury instructions that followed the statutory language was deficient performance. Instead, through inattention or lack of understanding of the legal standard, counsel neglected to propose jury instructions that were essential to the defense theory given the unusual case facts. *Compare United States v. Span*, 75 F.3d 1383, 1389–90 (9th Cir. 1996) ("Counsel's errors with the jury instructions were not a strategic decision to forego one defense in favor of another. They were the result of a misunderstanding of the law."); *Gray v. Lynn*, 6 F.3d 265, 269 (5th Cir. 1993) (finding counsel ineffective for failing to object to jury instruction that misstated elements of offense).

This Court should also conclude it is reasonably likely that, but for counsel's unprofessional error, the outcome of the trial would have been different. Again, this case involved unusual facts and a scenario where accumulating anxiety and fear eventually overwhelmed Mr. Johnson and caused him to kill Ryan. Thus, it was important that the jury be instructed that, to return a verdict on the lesser offense of manslaughter, they needed to find only that

**Page 35 BRIEF IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS**

Mr. Johnson acted under the influence of an extreme emotional disturbance and that his behavior was reasonable—not that he lacked the capacity to forego the homicide. Counsel's failure to ensure the jury was correctly instructed prejudiced Mr. Johnson.

**D.    Cumulative Error Denied Mr. Johnson A Fair Trial.**

The combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair. *Chambers v. Mississippi*, 410 U.S. 284, 290 n. 3 (1973). "[T]he fundamental question in determining whether the combined effect of trial errors violated a defendant's due process rights is whether the errors rendered the criminal defense 'far less persuasive.'" *Parle v. Runnels*, 505 F.3d 922, 928 (9th Cir. 2007) (quoting *Chambers*, 410 U.S. at 294). Where the errors involve multiple instances of deficient performance by counsel, the court should analyze the "aggregate prejudice" from counsel's omissions to determine their "cumulative effect." *Baer v. Neal*, 879 F.3d 769, 787 (7th Cir. 2018).

Here, each of counsel's omissions undermined critical aspects of his client's defense. Counsel allowed the State to present inadmissible evidence in support of an unproven inference regarding Mr. Johnson's intent, failed to make proper arguments for admission of key evidence to support a finding that Mr. Johnson acted under an extreme emotional disturbance, and failed to except to and propose jury instructions necessary to a fair determination of the facts. Thus, if the Court concludes the errors on their own did not prejudice Mr. Johnson, the Court should hold that the cumulative effect was to prejudice his defense and deny him a fair trial.

## VI.    Conclusion

For the foregoing reasons, this Court should grant the writ and order Mr. Johnson's release unless the State commences new trial proceedings within 60 days.

Respectfully submitted on May 24, 2024.

/s/ Susan F. Wilk
Susan F. Wilk
Assistant Federal Public Defender
